UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SHAUN RUEGGE,<br><br>Defendant. | 5:25-CR-50114-CCT-1<br><br>**ORDER ADOPTING REPORT AND RECOMMENDATION AND GRANTING DEFENDANT'S MOTION TO SUPPRESS** |

Defendant Shaun Ruegge is charged with possession of a firearm by a prohibited person and possession of a stolen firearm. Docket 1. The charges stem from a traffic stop at approximately 9:39 p.m. on March 13, 2025, in Rapid City, South Dakota. *See generally* Docket 43. Mr. Ruegge moves to suppress the evidence obtained from the search of his vehicle and any evidence obtained as a result of his subsequent arrest and interview, claiming the officers unlawfully extended the traffic stop without reasonable suspicion. Docket 29.

## BACKGROUND

Shortly before the traffic stop, Mr. Ruegge was driving a Chevy Suburban westbound on Minuteman Drive, which is in an area of Rapid City that has a higher number of calls for service, including for violent and drug-related crimes. Docket 43 at 7–8. Officers Parker Dadah and Nick Friedman of the Rapid City Police Department were traveling behind the Suburban and

1

observed it abruptly turn into a cul-de-sac. *Id.* at 8. Moments thereafter, the officers noticed the Suburban exit the cul-de-sac and continue westbound on Minuteman. *Id.* at 7–8. This made the officers suspicious and suggested to them that the driver might be avoiding law enforcement or was involved in a drug purchase. *Id.* at 21–22, 70.

Officer Friedman, who was driving, followed Mr. Ruegge's Suburban, and the officers noticed a non-working taillight. *Id.* at 8, 70. Officer Friedman initiated the traffic stop, and Mr. Ruegge pulled into and parked in the parking lot of an apartment complex. *Id.* at 71. Officer Friedman exited his patrol vehicle and made initial contact with Mr. Ruegge through the Suburban's driver's window. *Id.* Mr. Ruegge provided the officer his driver's license and gave a reason for his driving behavior. *Id.* at 12, 72. While Mr. Ruegge spoke to Officer Friedman, Officer Dadah shined his flashlight in and around the interior of the vehicle through the passenger-side windows. *Id.* at 19. Officer Dadah then walked toward the driver's side of the vehicle, and as he rounded the backside of the Suburban, Officer Friedman was walking to the patrol vehicle to run Mr. Ruegge's information. *Id.* at 19–20.

Officer Dadah approached Mr. Ruegge's window and asked Mr. Ruegge what he was up to. Exhibit 1 at 1:30. Mr. Ruegge replied that he was visiting a friend, but he was not able to state the address for the friend when asked by Officer Dadah. *Id.* at 1:31–1:41; Docket 43 at 12–13. Officer Dadah asked Mr. Ruegge to hop out of the car, and while Mr. Ruegge was complying with that request, Officer Dadah told him to put his hands on top of the vehicle. Exhibit

2

1 at 1:42–1:55. Mr. Ruegge placed his hands on top of the vehicle and faced his back to Office Dadah. *Id.* at 1:57. Officer Dadah asked Mr. Ruegge whether he had anything sharp or illegal on him, and Mr. Ruegge replied that he had a knife in his right pocket. *Id.* at 1:58–2:01. Officer Dadah retrieved the knife and a flashlight he thought was a second knife and placed them both in the pocket of the driver's-side door. *Id.* at 1:59–2:19.

Officer Dadah asked Mr. Ruegge for consent to search his pockets, and Mr. Ruegge replied, "Um, I don't see why there is a reason officer." *Id.* at 2:20–2:22. Officer Dadah replied, "So, I will tell you why there is a reason in my opinion. Suspicious driving. Butane lighters consistent with methamphetamine use." *Id.* 2:22–2:31. Officer Dadah also said, "So my thoughts on what is occurring tonight is you're either on your way to buy or you just bought." *Id.* at 2:32–2:38. Mr. Ruegge mumbled something not decipherable, and Officer Dadah said, "But I only do this job every day." *Id.* at 2:39–2:41. He asked Mr. Ruegge whether there is methamphetamine in the vehicle, and after Mr. Ruegge denied such, Officer Dadah asked him if there is methamphetamine on his person. *Id.* at 2:43–2:47. Mr. Ruegge denied that also. *Id.* at 2:46.

Officer Dadah asked Mr. Ruegge for consent to search his person, and Mr. Ruegge said, "No." Officer Dadah said, "Okay, cool. We are just going to hang out. I am going to check you for a firearm, okay?" *Id.* at 2:47–2:53. As he was frisking Mr. Ruegge, Officer Friedman walked toward the driver's side area of the Suburban, and Officer Dadah said to Officer Friedman, "We will take a K-9." *Id.* at 2:54–2:56. The officers' respective body camera footage shows

3

Officer Dadah making this request to Officer Friedman at approximately three minutes into the traffic stop. Officer Friedman walked back to the patrol vehicle and called for a K-9. Exhibit 2 at 2:57; Docket 43 at 73.

While waiting for the drug dog to arrive, the officers and Mr. Ruegge engaged in general conversation, and Officer Dadah asked additional investigative questions. *See generally* Exhibits 1 and 2. He asked Mr. Ruegge whether there was anything illegal in the vehicle, and Mr. Ruegge replied, "No." Exhibit 1 at 3:55–3:57. Officer Dadah asked for consent to search the vehicle, and Mr. Ruegge replied, "No." *Id.* at 3:58–3:59.

Officer Friedman—who had learned when he ran Mr. Ruegge's information prior to calling for a drug dog that Mr. Ruegge was on parole for burglary, narcotics-related offenses, forgery, and grand theft—asked Mr. Ruegge for the name of his parole officer. Exhibit 2 at 5:23. Mr. Ruegge replied, "Amanda." *Id.* at 5:24. Officer Dadah then asked Mr. Ruegge whether he wanted them to call his parole officer, noting that a condition of his parole is being subject to warrantless searches and seizures. Exhibit 1 at 5:26–5:37. Mr. Ruegge indicated he understood that obligation and that he would talk to her. *Id.* at 5:35–6:08. Officer Dadah asked Mr. Ruegge what he was out on parole for, and Mr. Ruegge said, "Burglary." *Id.* at 6:18–6:24. Officer Friedman added, "And drugs," and Mr. Ruegge said, "And yeah." *Id.* at 6:25–6:26. Officer Friedman then said, "And identity theft and forgery." Exhibit 2 at 6:27–6:29. Mr. Ruegge replied, "And forgery?" *Id.* at 6:30. Officer Friedman said, "Pretty sure, right? Unless I misread it." *Id.* at 6:32.

4

The officers and Mr. Ruegge continued conversing, and Officer Dadah asked Mr. Ruegge general questions. *See generally* Exhibits 1 and 2. At approximately seven minutes into the stop, Mr. Ruegge asked whether he was required to answer the questions. Exhibit 1 at 7:02. Officer Dadah replied, "No, not at all. We're just having conversation, yeah. I am the chatty guy." *Id.* at 7:05–7:09. After some silence, Mr. Ruegge said that he thought he saw his friend off in the distance, and when Officer Dadah said the person is bald and he thought Mr. Ruegge's friend was a female, Mr. Ruegge squinted his eyes to look in that direction and said his eyes were bad. *Id.* at 7:53–8:20.

Officer Dadah asked Mr. Ruegge whether he had anything to drink tonight, and Mr. Ruegge denied drinking. *Id.* at 8:51–8:54. He also denied having used marijuana, heroin, fentanyl, or methamphetamine and denied having any medical conditions. *Id.* at 8:55–9:16. The conversation returned to general matters; Officer Friedman asked Mr. Ruegge for his address, and Mr. Ruegge replied that he had recently moved and did not know the address. Exhibit 2 at 11:04–11:06. He was able to provide the location—the trailer park by Western Dakota Technical Institute—and the lot number at that trailer park. *Id.* at 11:24–11:31.

While general conversation continued, Mr. Ruegge heard his cell phone ring. Exhibit 1 at 12:40. He asked if he could answer the call, and on learning that the phone was inside the Suburban, Officer Dadah asked whether he could retrieve it for Mr. Ruegge because he does not want "people [to] reach back in the cars." *Id.* at 12:41–12:51. Officer Friedman opened the Suburban

door, retrieved the phone and a bottle of Mountain Dew, and handed both to Mr. Ruegge. *Id.* at 12:52–13:01.

As they continued to wait for the drug dog, now about 15 minutes into the stop, Officer Dadah told Mr. Ruegge, "Well, we appreciate you being cool with waiting. Some people get pretty, uh, spicy." *Id.* at 14:48–14:57. Officer Friedman added that Mr. Ruegge seemed "like a pretty relaxed guy." Exhibit 2 at 14:58.

A patrol vehicle arrived in the parking lot, and the officers thought it was the K-9 unit. Docket 43 at 90–91. It was not. *Id.* at 91. However, in anticipation that it was, Officer Dadah had Mr. Ruegge move to a location farther away from the Suburban. Exhibit 1 at 15:28. Mr. Ruegge asked if he could have a cigarette and indicated to Officer Dadah that the cigarettes were probably around the console of his vehicle. *Id.* at 15:32–15:36. Because Officer Dadah believed the drug dog had arrived, he said that he would let the K-9 unit "do their thing" and that either Mr. Ruegge would be leaving or the officer would retrieve Mr. Ruegge's cigarettes. *Id.* at 15:37–15:44. Mr. Ruegge sat on the curb while everyone continued to wait for the drug dog to arrive. *Id.* at 15:46.

Officer Ekaras Jackson arrived with the drug dog approximately 20 minutes into the traffic stop for the nonworking taillight. Docket 43 at 102. Officer Jackson approached Mr. Ruegge and asked him how he is doing. Exhibit 3 at 00:36. Mr. Ruegge replied, "Hey, I'm not too bad. How are you?" *Id.* at 00:36–00:39. Officer Jackson replied, "Not too bad" and then explained what he planned to do with his drug dog. *Id.* at 00:37–00:56. Ultimately, the drug

6

dog alerted to the presence of controlled substances at the rear of the vehicle. Docket 43 at 105–107. During a search of the Suburban, officers discovered a firearm underneath the rear passenger seat and a glass pipe on the center console that tested presumptively positive for methamphetamine. *Id.* at 16, 27, 75. No illegal items were found at the rear of the vehicle. *Id.* at 50.

Following his arrest, Mr. Ruegge filed the pending motion to suppress. Docket 29. This Court referred Mr. Ruegge's motion to a magistrate judge under 28 U.S.C. § 636(b)(1)(B). Magistrate Judge Wollmann held an evidentiary hearing, during which Officers Dadah and Friedman testified.[1] Docket 39. The government also entered into evidence body camera footage from the cameras worn by the officers. Exhibits 1, 2, 3.

At the suppression hearing, Officer Dadah testified that when he shined his flashlight into the passenger-side windows on first approaching the Suburban, he "observed a butane -- a large butane lighter." Docket 43 at 9. He further stated that "at some point" he saw "a cylinder object wrapped in a cloth." *Id.* at 10. The cloth was blue, and based on "the area of the town [the officers] were in" and his observation of the butane lighter, Officer Dadah "thought that that possibly could be some type of drug paraphernalia -- paraphernalia, some type of glass pipe." *Id.* Relying on his experience, he then explained how butane lighters and glass pipes work together. *Id.*

---

[1] Officer Jackson and Detective Chad Sayles also testified, and Officer Jackson's body camera footage, Exhibit 3, was entered into evidence.

When asked by the government about his past experience, as compared to his peers, in locating drugs and firearms, Officer Dadah testified: "I would say during my time with the Rapid City Police Department, I located significantly more illegal substances and firearms than my peers. I -- it's something that I found a lot of purpose in, and I attempted to do while working with the Rapid City Police Department." *Id.* at 12. He agreed he has a knack for it. *Id.*

Counsel then asked Officer Dadah to explain why he asked Mr. Ruegge to step out of the Suburban shortly after the stop. *Id.* at 13. He replied,

> Due to everything that was occurring, and my observations and my -- my conversation with him, I just thought that there was a lot of oddities. And I wanted to continue to speak with him. And I also -- based on my experience, if you leave someone alone in a car, then they -- they -- they can have the ability to move things around and stuff like that. If I get them out of the vehicle, whatever's in the car stays where it's at. There's no one there that can manipulate anything.

*Id.* According to Officer Dadah, after observing the cylinder item in the blue cloth and the butane lighter, the stop transformed from an investigatory stop of Mr. Ruegge's traffic violation to a drug-related investigation. *Id.* Officer Dadah requested the K-9 because he "believed there was going to be some type of illegal substance in the vehicle." *Id.* at 14.

During the search of the vehicle, Officer Dadah unrolled the blue cloth and observed a glass pipe containing white residue that later tested presumptively positive for methamphetamine. *Id.* at 16, 28. Officer Dadah agreed that the item in the blue cloth turned out to be what he had suspected.

8

*Id.* at 16. The government asked, in reference to portions of the body camera footage, to say again what he had observed at approximately two minutes into the stop, which was before he requested the drug dog. *Id.* at 19–20. Officer Dadah replied, "I observed the butane lighter. I don't recall at what point I see the blue cloth -- cloth object." *Id.* at 20. Counsel asked, "You don't recall exactly when it happened, but at this point, by the time you've had him come out, have you already noted the blue cloth object?" *Id.* Officer Dadah replied, "I -- I don't recall if I observed it prior to him hopping out or when I am -- I essentially -- he has, if I recall, a knife or some object, and I put it in the car. I don't know if I observe it during that or during -- prior to having him exit the vehicle." *Id.*

Counsel then inquired whether Officer Dadah had observed both the butane lighter and suspected object when taking things out of Mr. Ruegge's pockets at about two minutes and twenty-two seconds into the stop, and Officer Dadah replied, "I believe so. I -- I don't recall specifically when I observed that." *Id.* Counsel pressed for a narrower answer: "You don't recall exactly. You indicated earlier it might have been when you looked into the car or after you're putting -- putting items back in. Do you know at what point for certain, at a time, even if you can't recall exactly when, by what point in time you were certain that you had made note of that object?" *Id.* at 20–21. Officer Dadah testified, "I -- I don't recall specifically. I believe by this point I had observed it, 'cause I request a K9 shortly after this." *Id.* at 21.

9

Officer Dadah also testified about why he believed Mr. Ruegge's driving behavior prior to the stop was suspicious.

> I thought the driving behavior was very odd in the beginning. I just wouldn't understand why you would pull into a cul-de-sac, to almost immediately come back the same direction you were going. This area of Rapid City, in my experience, has -- I've just located a lot of illegal substance[s] and such in this sector of Rapid City. As well as observing the items in the vehicle, the lighter and that cylinder-shaped object in blue, I just -- I just thought all these things individually were odd. And, based on my experience, I thought there was a high likelihood in this area of Rapid City that he could either have been leaving somewhere he had bought an illegal substance or coming to this apartment building to purchase an illegal substance.

*Id.* at 21–22. Along with the above, Officer Dadah testified that he considered, in determining that he had reasonable suspicion to extend the stop, the time of night, that Mr. Ruegge appeared fidgety and nervous, and the officer's "experience with stopping vehicles at this time of night in this area and locating illegal substances." *Id.* at 22.

On cross-examination, Officer Dadah agreed that his determination that reasonable suspicion existed to extend the stop was based in part on his observation of the blue cloth that appeared to contain a methamphetamine pipe. *Id.* at 31. He also agreed that when he told Mr. Ruegge at the scene why he was going to be searched, he referred only to the butane lighter and suspicious driving. *Id.* Officer Dadah further agreed that he did not at any time tell Mr. Ruegge that he had observed the blue cloth. *Id.* at 32.

Counsel referred Officer Dadah to a portion of the body camera footage from the search of the Suburban when it appears Officer Dadah discovered the item in the blue cloth was indeed a methamphetamine pipe. *Id.* at 34–35.

10

Officer Dadah testified that he said "[s]omething to the effect of, *I'm betting this is going to be a meth pipe*[,]" and then he said, "*It is a meth pipe*[.]" *Id.* at 35.

Counsel challenged Officer Dadah's decision to first search the door of the Suburban and then the items on the console rather than first going to the blue cloth he suspected to contain a methamphetamine pipe. *Id.* 35–36. Officer Dadah agreed that he did not go first to the blue cloth when he began to search the Suburban. *Id.* at 36. He also agreed that he did not articulate to Officer Friedman or anyone that he saw the item he believed to be the methamphetamine pipe, that is until he found the methamphetamine pipe during the search. *Id.* Officer Dadah further agreed during his testimony that later on during the search, he said something to Officer Friedman about not having observed the pipe when he was on the passenger side. *Id.* at 52.

Also during cross-examination, counsel asked Officer Dadah about the additional reasons he believed he had reasonable suspicion to extend the stop, including that Mr. Ruegge appeared fidgety and nervous. *Id.* at 47. Officer Dadah testified that while he noted in the report he completed after the stop that Mr. Ruegge appeared fidgety and nervous, he could not articulate from watching his body camera footage "what exactly [he] was referring to." *Id.* He also could not "recall anything specifically, other than the -- [he] -- [he] had that feeling at some point in the interaction." *Id.* He agreed "[f]or the most part" that Mr. Ruegge "wasn't fidgety, he wasn't moving around, he wasn't doing anything -- [ ] he leaned against the car and was just super casual while you

11

were just talking[.]" *Id.* at 48. Officer Dadah also agreed that Mr. Ruegge "asked to go sit down, and he just sat down" without showing signs of nervousness. *Id.*

On redirect examination, counsel clarified Officer Dadah's statement he made to Officer Friedman about not seeing the pipe wrapped in the blue cloth when he was on the passenger side. *Id.* at 59. Counsel asked Officer Dadah, "But then you saw it on the driver's side shortly after that?" *Id.* Officer Dadah replied, "Correct." *Id.* Counsel also asked, as a point of clarification, to explain his recollection that Mr. Ruegge was fidgety and nervous. *Id.* at 60–61. Officer Dadah agreed that he had a feeling at the time that Mr. Ruegge was fidgety and nervous and that information formed a basis of his determination that reasonable suspicion existed. *Id.* He also agreed that his body camera does not show exactly what he was seeing and that he could have seen something that suggested to him Mr. Ruegge was fidgety and nervous that was not picked up on the body camera. *Id.* at 61.

Officer Dadah, though agreeing that having a butane lighter on its own is not proof of drug activity, testified that the presence of a butane lighter under the circumstances gave him reasonable suspicion based on his experience observing them during his time as a police officer and his view that "they almost come hand in hand with methamphetamine pipes." *Id.* at 61–62. He also testified that "based on [his] experience, when [he has] located methamphetamine pipes and things of that nature, it's not uncommon at all to also find butane lighters and things of that nature[,]" and "based on [his]

12

experience, [he] know[s] that is a common way to assist with the consumption of an illegal substance, using a meth pipe." *Id.* at 62.

Officer Friedman testified similarly about Mr. Ruegge's driving behavior prior to the stop and the reason for the stop. *Id.* at 70–71, 79. He then explained the process by which he ran Mr. Ruegge's information and indicated that he found out Mr. Ruegge was on parole. *Id.* at 72–73. Officer Friedman testified that he did not inform Officer Dadah of Mr. Ruegge's parole status or drug history before Officer Dadah requested that he call a K-9 unit. *Id.* at 73, 85. Officer Friedman also testified that when he called for the K-9 unit, he told Officer Jackson over the phone about the stop, that the vehicle appeared to attempt to evade law enforcement contact, and that the driver has a drug history. *Id.* at 74.

On cross-examination, Officer Friedman agreed that Mr. Ruegge's suspicious driving behavior would not have given the officers cause to initiate a traffic stop. *Id.* at 83. He also agreed that he did not at any point start to or ever issue a ticket for the taillight violation. *Id.* at 84. And he agreed that Mr. Ruegge "was just standing around, relaxed, while . . . [they] waited 20 minutes for a drug dog[.]" *Id.* at 94.

When counsel asked whether there was a methamphetamine pipe in plain view at the time of initial contact with Mr. Ruegge, Officer Friedman replied, "I am not going to testify to whatever my partner saw -- was able to see at the time. He hadn't -- he hadn't communicated to -- to me what he had seen at that time." *Id.* at 88. Officer Friedman indicated that he did not "believe" that

13

Officer Dadah conveyed to him what he saw that he believed to be a methamphetamine pipe. *Id.* at 88–89. After noting that it is common for officers to mute their microphones to have an unrecorded conversation, counsel asked Officer Friedman whether Officer Dadah told him at any point "that there was a blue cloth that he suspected to be a methamphetamine pipe," and Officer Friedman replied, "I don't believe so." *Id.* at 97–98.

At the conclusion of the suppression hearing, Magistrate Judge Wollmann heard oral arguments from counsel and informed counsel that the court would take the matter under advisement. *Id.* at 112–22. Thereafter, Magistrate Judge Wollmann issued a sixty-three-page Report and Recommendation, recommending that Mr. Ruegge's motion to suppress be granted. Docket 44.

Magistrate Judge Wollmann determined that "the record does not clearly establish when Officer Dadah first observed the blue cloth-wrapped object," and ultimately the magistrate judge did "not find his testimony credible that he knew the object was a meth pipe when he asked Officer Friedman to request a K-9." *Id.* at 54. Also bearing on credibility, the magistrate judge found that Officer Dadah's information in his report that Mr. Ruegge appeared fidgety and nervous was "inaccurate" because "[t]he video clearly depicts that Mr. Ruegge was calm and patient." *Id.* Magistrate Judge Wollmann surmised that Officer Dadah's suspicions at the time he requested the K-9 unit included only that Mr. Ruegge drove suspiciously in a high crime area and had a butane lighter in the Suburban. *Id.* Although Officer Friedman possessed knowledge concerning

14

Mr. Ruegge's parole status and drug history, Magistrate Judge Wollmann did not consider his knowledge in conjunction with Officer Dadah's observations because the officers did not communicate with each other before Officer Dadah requested the K-9 unit. *Id.* at 59.

The government objects to Magistrate Judge Wollmann's Report and Recommendation. Docket 48. It identifies "two primary categories of objections" as: "the magistrate judge's factual findings regarding an assertion by Officer Dadah and the credibility determination to that assertion" and "the magistrate judge's legal determination that no reasonable suspicion of a drug-related crime existed when a drug dog was called and that the stop was unreasonably prolonged." *Id.* at 1–2. Relatedly, the government objects to the ultimate decision recommending that the evidence be suppressed. *Id.* at 2.

## LEGAL STANDARD

This Court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Federal Rule of Criminal Procedure 59. Because motions to suppress evidence are considered dispositive matters, the Court reviews de novo "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b); *United States v. Raddatz*, 447 U.S. 667, 673–74 (1980). In doing so, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" and "may also receive further evidence or recommit the matter to the magistrate

15

judge with instructions." 28 U.S.C. § 636(b)(1); Fed. R. Cim. P. 59; *United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## DISCUSSION

### I. The Government's Factual Objections

When considering objections "to the factual findings of a magistrate judge, the district judge must make its own *de novo* determination of the facts with no deference to the magistrate judge's findings." *United States v. Running*, 698 F. Supp. 2d 1186, 1189 (D.S.D. 2009). In doing so, "the district judge must make an independent review of the record, including tapes of evidence and the transcript of evidentiary hearings before the magistrate judge." *Id.* The Court must also review the magistrate judge's credibility determinations de novo. *United States v. Moua*, 145 F.4th 929, 934–35 (8th Cir. 2025).

The government objects to the magistrate judge's statement that the court does "not find [Officer Dadah's] testimony credible that he knew the object was a meth pipe when he asked Officer Friedman to request a K-9" and related statements in the report concerning what Officer Dadah knew and recognized. Docket 48 at 8–9 (alteration omitted). The government focuses specifically on the magistrate judge's use of the word "knew." *Id.* at 8. It claims that Officer Dadah never testified that he *knew* what the item was or that he in fact recognized it as a methamphetamine pipe; rather, he testified that he *suspected* it to be pipe. *Id.* The government thus argues that the finding above is not supported by the record and evinces that the magistrate judge's credibility determination is based on a misunderstanding of the record. *Id.* at 9.

16

From the Court's independent review of the record, including the transcript of the suppression hearing and the video evidence, Officer Dadah did not testify that he *knew* the object in the blue cloth was a methamphetamine pipe or that he in fact recognized the object to be a methamphetamine pipe. Officer Dadah consistently testified he *believed* the item in the blue cloth could possibly be a methamphetamine pipe. *See, e.g.,* Docket 43 at 10, 20, 31, 35.

However, the Court does not ascribe the same weight as the government to the magistrate judge's use of the word "knew" and related statements regarding what Officer Dadah recognized. Throughout the Report and Recommendation, Magistrate Judge Wollmann referred to Officer Dadah's belief that the item in the blue cloth could be a methamphetamine pipe. *See, e.g.,* Docket 44 at 28 ("Officer Dadah testified that he did not tell anyone that he believed he had seen a meth pipe, or what he believed might be a meth pipe . . . . Officer Dadah explained that although he believed there was an item in the vehicle that could be a meth pipe, he first searched the driver's door pocket, the butane lighter, and the vape before unwrapping the blue cloth."); *see also id.* at 52 ("Furthermore, when Officer Dadah contemporaneously explained his suspicion after asking to search Mr. Ruegge, he did not mention the object wrapped in the blue cloth or that he suspected it to be a meth pipe.").

It is thus clear to the Court that Magistrate Judge Wollmann understood the evidence in the record when making the credibility determination. Notably, the magistrate judge's credibility determination relates to *when* Officer Dadah

17

allegedly formed his suspicion about the item in the blue cloth, not whether he knew versus suspected that it was a methamphetamine pipe. The Court overrules the government's objection to the import of the word "knew" and claim that the magistrate judge misunderstood the record.

The government also objects to the "intimation" from the magistrate judge's use of the transition word "however" between two sentences that Officer Dadah made during the search of the Suburban. Docket 48 at 12. The Report and Recommendation contains the following two sentences:

> Approximately thirty minutes after the stop was initiated, Officer Friedman's body camera captured Officer Dadah admitting not seeing the blue cloth while he was on the passenger side of Mr. Ruegge's Suburban. *However,* the body camera audio suggests that Officer Dadah saw the blue cloth-wrapped cylindrical object when he was on the driver's side.

Docket 44 at 53 (emphasis added). According to the government, "[t]he use of the word, 'however,' suggests that these two sentences demonstrate an inconsistency with Officer Dadah's statements on where he saw the object he suspected was a meth pipe" when these statements "comport with one another." Docket 48 at 12.

It appears the use of "however" is grammatically unwarranted. Setting that aside, though, the Court does not read the word "however" as an indication that the magistrate judge deemed Officer Dadah's statements to be inconsistent. Rather, the quoted sentences from the Report and Recommendation are part of a longer paragraph in which the magistrate judge relates various statements Officer Dadah made about the timing of his observation of the item he suspected to be a methamphetamine pipe. And this

18

paragraph is one of several paragraphs preceding the magistrate judge's ultimate finding that "the record does not clearly establish when Officer Dadah first observed the blue cloth-wrapped object[.]" *See* Docket 44 at 52–54. The government's objection to the "intimation" is overruled.

The government further objects to Magistrate Judge Wollmann's reasoning supporting the determination as to Officer Dadah's credibility. Docket 48 at 9–12. The government argues that the magistrate judge's credibility determination is not supported because "[a]n officer does not have to say aloud each part of his reasonable suspicion"; "[i]t it is not abnormal to not know the exact second in time a thought occurred in someone's mind"; and the fact Officer Dadah called for a K-9 unit shows he did not ignore the suspected drug paraphernalia. *Id.* at 10–12. The government also asserts that it is "innocuous" that Officer Dadah "does not recall the exact moment of when he saw the methamphetamine pipe" because he testified that he noticed the blue-clothed item before the K-9 call and because the statements he made during the search corroborate that he saw the blue-clothed item shortly into the encounter. *Id.* at 10–11.

During the suppression hearing, Officer Dadah repeatedly said that he could not recall when he noticed the blue-clothed item. *See* Docket 43 at 10, 20–21, 31. And when asked more specifically on direct examination—"by what point in time you were certain that you had made note of that object"—Officer Dadah replied that he *believed* he had observed it by the time he was putting items into the vehicle "'*cause* [he] request[ed] a K9 shortly after this." *Id.* at 21

19

(emphasis added). Officer Dadah later maintained that he had observed the blue-clothed item at some point before calling for a dog sniff. However, this Court, as well as the magistrate judge who listened to Officer Dadah testify live, deems more telling that Officer Dadah did not mention—to anyone—at any point prior to him actually holding the blue-clothed item in his hand that he suspected it contained a methamphetamine pipe.

Of course, Officer Dadah was not required to articulate every thought or basis for his reasonable suspicion determination to Officer Friedman or Mr. Ruegge prior to requesting a K-9 unit. However, this Court is likewise not required to accept indiscriminately Officer Dadah's testimony that he must have seen the blue-clothed item before requesting a dog sniff because he requested a dog sniff. Neither was the magistrate judge required to do so.

Nevertheless, the government contends that because Officer Dadah remarked during the search before opening the blue-clothed item that he thought it was going to be a methamphetamine pipe, it is clear he "did in fact suspect the item to be a meth pipe before opening it." Docket 48 at 10. While Officer Dadah did state, as he held the blue-clothed item in his hand and unwrapped it, that he had a feeling it would be a meth pipe, his statement supports that he formed the suspicion about the item while holding the blue-cloth in his hand, not before then.

But the government points to Officer Dadah's statements from later in the search as support that he saw the blue-clothed item while he was talking to Mr. Ruegge before calling for the K-9 unit. Docket 48 at 11. Through Officer

Friedman's body camera footage, because Officer Dadah muted his microphone, Officers Dadah and Friedman can be heard discussing the drug dog alerting at the back of the Suburban when no drugs or guns were found in that location. Exhibit 2 at 32:28–32:31. Officer Friedman said, "Him hitting on the back is what's interesting to me, you know what I mean?" *Id.* Officer Dadah's reply is not as clear because he is not close enough to Officer Friedman's active microphone; however, Officer Dadah appears to have said, "I agree [not decipherable] pipe directly on the center console, which I am quite positive I did not observe when, uh, I was on the passenger side. And then when I came around to talk to him, I saw him [not decipherable] bright blue cloth. I think he pulled it out when I was coming around." *Id.* at 32:33–32:56. Officer Friedman replied, "Yeah, you're probably right. That's on me. I probably should have waited for you." *Id.* at 32:57–33:04.

These statements do not corroborate Officer Dadah's testimony at the suppression hearing that he suspected before he called for a K-9 unit that the blue cloth contained a methamphetamine pipe. Importantly, Officer Dadah did not say to Officer Friedman during the search, that when he came around to talk to Mr. Ruegge and saw this bright blue cloth, he had suspected it contained a methamphetamine pipe. Nor is it reasonable to infer from his statements to Officer Friedman during the search that he saw this blue-clothed item before requesting a dog sniff. Rather, a more reasonable inference in light of the other evidence is that Officer Dadah had a mere hunch, prior to asking

21

Officer Friedman to call a K-9 unit, that he would find evidence of drug use in the Suburban and that hunch was confirmed during the search.

After a de novo review of Magistrate Judge Wollmann's credibility finding, the Court agrees that Officer Dadah's testimony that he observed the blue-clothed item, suspected to contain a methamphetamine pipe, before directing Officer Friedman to call a K-9 unit, is not credible. This does not mean that the Court believes Officer Dadah lied on the stand. Rather, the Court concludes that Officer Dadah's testimony on the timing of his observation was too equivocal and uncertain, especially when considered in light of other evidence, to support finding that Officer Dadah saw the blue-clothed item before extending the stop. The Court also concludes that it is unnecessary to hold a de novo hearing because the Court does not have doubts about Magistrate Judge Wollmann's credibility determination.

The government objects to additional specific findings by Magistrate Judge Wollmann. Docket 48 at 10–12. It objects to the finding that "Officer Dadah's creditability is further undermined by his inaccurate report that Mr. Ruegge appeared fidgety and nervous. The video clearly depicts that Mr. Ruegge was calm and patient." Docket 44 at 54. The government does not dispute that Officer Dadah could not recall at the suppression hearing what had made him write in his report that Mr. Ruegge was nervous and fidgety. *See* Docket 48 at 10. However, it asserts that "[f]ailing to remember what movements made Officer Dadah think that [Mr. Ruegge] was nervous does not

22

indicate that Officer Dadah had lied about seeing a blue-clothed item that he suspected to be a methamphetamine pipe." *Id.*

The Court overrules this factual objection. Magistrate Judge Wollmann did not find that Officer Dadah lied about seeing the blue-clothed item. Rather, the magistrate judge made a credibility determination based on the reliability of Officer Dadah's statements about when he observed the blue-clothed item. And in doing so, the magistrate judge considered the totality of the evidence, including that Officer Dadah's documentation in his police report that Mr. Ruegge was fidgety and nervous did not line up with what was shown on all three officers' body camera footage and that neither Officer Dadah nor Officer Friedman could identify in what way Mr. Ruegge was nervous or fidgety.

The government also objects to the magistrate judge's finding that Mr. Ruegge's "cul-de-sac turn may look evasive, but it is still ambiguous, and Mr. Ruegge offered an immediate innocent explanation that his vehicle was 'dying.'" Docket 44 at 56. According to the government, "the magistrate judge offers no explanation for why turning off the road and straight back onto it somehow remedies a dying car." Docket 48 at 12–13. The Court overrules this factual objection because the magistrate court did not make a credibility finding on the officers' testimony at the suppression hearing regarding the veracity of their belief that Mr. Ruegge drove suspiciously. *See, e.g.*, Docket 44 at 60 (noting both officers' observation that Mr. Ruegge's driving was suspicious). Further, the magistrate judge's statement in this regard is within the judge's explanation of why Mr. Ruegge's driving behavior did not lead the judge to

23

conclude that the officers had reasonable suspicion to extend the stop. As such, the suspicious nature of Mr. Ruegge's driving behavior is more properly considered as part of the government's objection to the magistrate judge's legal determination on reasonable suspicion.

Finally, the government objects to the magistrate judge's finding that "Officer Dadah's reliance on the presence of a butane lighter as evidence of drug activity, without anything more, fails to rise to the level of reasonable suspicion." Docket 44 at 57. The government does not assert that the premise of the quoted sentence—that evidence of a butane lighter without more does not give rise to reasonable suspicion—is incorrect. Rather, the government takes issue with this finding because in its view "law enforcement had far more than just a butane lighter as evidence of drug activity[.]" Docket 48 at 13. Because, similar to the above objection, this objection relates more to the magistrate judge's legal conclusion that the officers did not have reasonable suspicion, the factual objection is overruled as moot and the information known to the officers will be addressed below.

## II.     The Government's Legal Objections

The government contends that the magistrate judge erred in determining "that no reasonable suspicion of a drug-related crime existed when a drug dog was called" and relatedly erred in concluding "that the stop was unreasonably prolonged." *Id.* at 1–2. The government's argument, however, relies in part on Officer Dadah's testimony that he observed the blue-clothed item prior to requesting Officer Friedman call a K-9 unit. *See id.* at 15. Officer Dadah's

testimony that he observed the blue-clothed item before requesting a dog sniff has been discredited. Therefore, the Court does not consider it when assessing whether reasonable suspicion of drug activity existed in this case.

"A stop that is lawful at the start still violates the Fourth Amendment 'if it lasts longer than necessary to effectuate its mission—to address the traffic violation that warranted the stop and attend to related safety concerns.'" *United States v. Johnson*, 166 F.4th 1116, 1118 (8th Cir. 2026) (quoting *United States v. Navarette*, 996 F.3d 870, 874 (8th Cir. 2021)). Therefore, "[w]ithout reasonable suspicion of separate criminal behavior, [officers] 'may not conduct unrelated checks that extend the stop beyond the time reasonably required to complete its original mission.'" *Id.* at 1119 (citation omitted). "A K9 sniff is an unrelated check[,]" *Id.*, because it "is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing[,]'" *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (first alteration in original) (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)).

The government does not object to the magistrate judge's determination, Docket 44 at 54, that the officers had abandoned the traffic mission once the decision to call the K-9 unit had been made. Therefore, the Court considers whether the officers had reasonable suspicion at the time Officer Dadah requested Officer Friedman call a K-9 unit and thus whether the stop was unreasonably prolonged. *See Rodriguez*, 575 U.S. at 357 (providing that the detention for the dog sniff must be "independently supported by individualized suspicion").

25

"Reasonable suspicion requires an officer to have 'a particularized and objective basis for suspecting legal wrongdoing based upon his own experience and specialized training.'" *United States v. Pacheco*, 996 F.3d 508, 511 (8th Cir. 2021) (quoting *United States v. Jones*, 606 F.3d 964, 965–66 (8th Cir. 2010)). "The standard depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. Brown*, 60 F.4th 1179, 1182 (8th Cir. 2023) (citation omitted). Also, "[o]fficers are allowed 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Id.* (citation omitted). "The officer's reasonable suspicion cannot be, however, just a mere hunch or based on circumstances which 'describe a very large category of presumably innocent travelers.'" *United States v. Jones*, 269 F.3d 919, 927 (8th Cir. 2001) (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)).

"In analyzing whether an officer had reasonable suspicion, [courts] look to the totality of the circumstances." *Brown*, 60 F.4th at 1182. Further, courts "view the totality of the circumstances not from an individual officer's subjective standpoint, but from the standpoint of an objectively reasonable officer." *United States v. Betts*, 88 F.4th 769, 774 (8th Cir. 2023).

Based on the totality of the circumstances here, Officers Dadah and Friedman did not have reasonable suspicion to extend the detention for a dog sniff. While the officers had observed driving behavior they believed to be suspicious, Mr. Ruegge offered an explanation, and neither Officer Dadah nor

26

Officer Friedman testified that Mr. Ruegge's explanation was inconsistent with anything they had observed during the stop or that his explanation raised their suspicions. Further, innocent drivers could just as well drive into and quickly out of a cul-de-sac at 9:30 p.m. in Rapid City's higher-crime areas. As such, Mr. Ruegge's driving behavior, without more, would not provide an articulable basis warranting a reasonable belief that his Suburban contained an illegal substance. *See United States v. Stachowiak*, 521 F.3d 852, 856 (8th Cir. 2008) (noting that "the officer's subjective perceptions of the driver's nervous behavior or evasive driving standing alone may not be sufficient to constitute a reasonable, articulable suspicion"); *United States v. Beck,* 140 F.3d 1129, 1137–38 (8th Cir. 1998) (discounting the officer's consideration that defendant traveled from a drug-source state because millions of innocent people reside in the source state and travel).

Also, although Officer Dadah saw a butane lighter on Mr. Ruegge's console, he agreed that possessing a butane lighter in and of itself is not proof of drug activity. Docket 43 at 45. He also agreed that he did not observe slurred speech, smell the odor of alcohol or marijuana, or observe other indicators of drug use. *Id.* at 46–47. As the Eighth Circuit has explained, a person's mere possession of an "innocent lighter" without other more revealing facts is worth little weight. *See Betts*, 88 F.4th at 775 (considering additional contextual facts, including meth-use indicators, with the presence of the butane lighter).

The Court gives similarly little weight to Mr. Ruegge's inability to provide his friend's street address. While an odd response to a routine question can

cause suspicion, *United States v. Murillo-Salgado*, 854 F.3d 407, 416 (8th Cir. 2017) (finding reasonable suspicion to extend traffic stop based on odd responses to routine questions), not knowing a friend's street address is not odd. Officer Dadah agreed, testifying, "I don't think everyone knows all of their friends' addresses." Docket 43 at 42.

Further, even though Officer Dadah provided in his report that Mr. Ruegge was nervous and fidgety, Officer Dadah could not recall why he made that notation. Moreover, both officers testified at the suppression hearing that nothing in the body camera footage showed Mr. Ruegge acting nervous or fidgety. Both officers even commented during the encounter on how calm Mr. Ruegge was. But even if Mr. Ruegge showed signs of nervousness, including fidgeting, "nervousness is of limited significance in determining reasonable suspicion." *See Jones*, 269 F.3d at 928. Therefore, any suspicion Mr. Ruegge's behavior produced is minimal at best. *See Beck*, 140 F.3d at 1134 ("It certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer.").

Finally, whether the information known by the officers is viewed alone or in combination with each other, the totality of the circumstances does not rise to the level of a particularized and objective basis for suspecting legal wrongdoing. Therefore, Magistrate Judge Wollmann properly determined "that the officers lacked reasonable suspicion to prolong the stop." Docket 44 at 61.

However, the government contends that under the collective knowledge doctrine, the reasonable suspicion assessment must also consider the

28

information known by Officer Friedman, namely Mr. Ruegge's parole status and drug history. Docket 48 at 13–15. "The collective knowledge doctrine imputes the knowledge of all officers involved in an investigation upon the seizing officer in order to uphold 'an otherwise invalid search or seizure.'" *United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008) (quoting *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001)). "Applying the doctrine requires some degree of communication between the officer who possesses the incriminating knowledge and the officer who does not." *Id.*; *United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000). "This requirement distinguishes officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject." *United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005).

As an example, the collective knowledge doctrine was applied in *United States v. Robinson*, 664 F.3d 701 (8th Cir. 2011). There, Detective Thomas had probable cause to stop a suspect vehicle after observing one or more traffic violations. *Id.* at 703. But the detective was in an unmarked vehicle, and per department policy, he could not initiate a traffic stop. *Id.* Therefore, the detective "called Patrol and asked that a patrol car stop the Cadillac." *Id.* Thereafter, Officer Roebuck, who did not have possession information supporting probable cause, initiated the traffic stop. *Id.* at 703–04.

On appeal, the defendant asserted that the district court erred in applying the collective knowledge doctrine. *Id.* at 703. He claimed that the government was required to "present evidence of what 'the officer who actually

29

made the stop knew when he stopped the Cadillac[,]'" because "Detective Thomas testified that he told the Patrol dispatcher only that 'I need some officers to stop this maroon Cadillac'" and Officer Roebuck did not testify. *Id.* at 703–04.

The Eighth Circuit noted that the collective knowledge doctrine requires some degree of communication between the officers. *Id.* at 703. However, the Court explained that when officers are functioning as a team, the collective knowledge doctrine does not require the directing officer to share all relevant knowledge with the officer who makes "the stop, the arrest, or the search at issue." *Id.* at 704. Because Detective Thomas had probable cause, and Officer Roebuck did not act independently when instructed to make the stop, Officer Roebuck "became part of Detective Thomas's 'team' for purposes of the collective knowledge doctrine." *Id.*

The Tenth Circuit Court of Appeals described this type of collective knowledge relationship as "vertical." *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008). Vertical collective knowledge applies where one officer has probable cause or reasonable suspicion and directs another officer to act without first communicating the facts justifying the action. *Id.* Under that type of scenario, the knowledge forming reasonable suspicion or probable cause, as the case may be, is imputed to the officer carrying out the stop or search because the initiating officer had the necessary corpus of information. *See id.* at 1345–46.

30

Here, though, the government is attempting to use a type of "horizontal" collective knowledge, whereby the information known by both Officers Dadah and Friedman is pooled. *See id.* at 1345. But neither officer individually has reasonable suspicion; therefore, the application of the collective knowledge doctrine requires that there to be some degree of communication between the officers. *Compare Gillette*, 245 F.3d at 1034 (concluding "that there was the requisite degree of communication between" the deputy and the officers at the scene to make the acting officer a member of their team and to impute the other officer's knowledge to him), *with United States v. Ellis*, 499 F.3d 686, 689–90 (7th Cir. 2007) (declining to impute knowledge by officers at a front door of a home to an officer who entered the home through a side door because there was no communication between the officers).

As the Eighth Circuit has explained, "[reasonable suspicion] may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene *if there is some degree of communication.*" *United States v. Edwards*, 891 F.3d 708, 711–12 (8th Cir. 2018) (citation omitted) (emphasis added) (upholding arrest because officer initiating the traffic stop was told that the defendant "was under investigation for drug trafficking and that there was probable cause to believe that [he] had just obtained drugs"). Because it is undisputed that neither Officer Dadah nor Officer Friedman communicated with each other and neither officer was privy to the information purportedly bearing on the question of reasonable suspicion of

31

drug activity held by the other, the magistrate judge properly declined to apply the collective knowledge doctrine in this case.

## CONCLUSION

Officer Dadah and Officer Friedman's otherwise valid traffic stop lasted longer than necessary to accomplish the stop's mission, and Officer Dadah's decision to prolong the detention for a dog sniff was not based on reasonable suspicion of separate criminal behavior. Therefore, the prolonged detention violated the Fourth Amendment, and the evidence obtained from the search of the Suburban must be suppressed.[2] *See Johnson*, 166 F.4th at 1120. Likewise, the subsequent interview of Mr. Ruegge and blood sample, buccal swab, and their testing are fruit of this constitutional violation and must be suppressed. *See id.* (citing *United States v. Swope*, 542 F.3d 609, 613–14 (8th Cir. 2008) ("The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree.")).

---

[2] Although the government refers to the exclusionary rule, it does not argue against application of that rule here. *See Johnson*, 166 F.4th at 1120 n.2 (noting the same).

32

Accordingly, it is hereby

ORDERED that the government's objections to the Report and Recommendation, Docket 48, are overruled. It is further

ORDERED that the Report and Recommendation, Docket 44, is adopted in full. It is further

ORDERED that Mr. Ruegge's motion to suppress, Docket 29, is granted.

Dated June 29th, 2026.

BY THE COURT:

CAMELA C. THEELER
UNITED STATES DISTRICT JUDGE